UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cause No.: 1:07-CR-67-TLS |
| | ) | |
| MARCUS ALLEN HAYDEN | ) | |

## OPINION AND ORDER

This matter is before the Court on the Defendant's Motion to Suppress [DE 19], filed on December 28, 2007. For the reasons stated herein, the Defendant's motion is denied.

## BACKGROUND

On July 25, 2007, the grand jury returned a three count indictment along with a forfeiture allegation against the Defendant. Count one charges that the Defendant possessed, with the intent to distribute, less than fifty kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1). Count two charges that the Defendant carried a firearm during and in relation to the commission of count one in violation of 18 U.S.C. § 924(c). Count three charges that the Defendant possessed a firearm in and affecting commerce, which he was prohibited from doing because of a prior misdemeanor domestic violence conviction, in violation of 18 U.S.C. § 922(g)(9). If convicted of count two or count three, the indictment alleges that the Defendant must forfeit the firearm and ammunition involved in the commission of the offense pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2462(c).

The Defendant appeared before Magistrate Judge Roger B. Cosbey on August 6, 2007, and pleaded not guilty to all charges in the indictment. The Defendant filed the motion to suppress at issue on December 28, 2007 [DE 19], and the government responded on January 3,

2008 [DE 20]. The Court held an evidentiary hearing on January 17, 2008. The Defendant was present and represented by attorney Robert W. Gevers, II. The government was represented by Assistant United States Attorney Anthony W. Geller. At the conclusion of the hearing, the Court took the motion under advisement and gave the parties additional time to file briefs. The Defendant filed his Memorandum in Support of Defendant's Motion to Suppress [DE 23] on March 20, 2008. The government filed its Response to Defendant's Motion to Suppress Brief [DE 24] on April 21, 2008. The Defendant filed his Reply to Government's Response [DE 25] on May 1, 2008.

## FINDINGS OF FACT

After considering the evidence submitted at the evidentiary hearing and considering the credibility of the witnesses, the Court makes the following findings of fact.

In the early morning hours of June 6, 2007, the Fort Wayne Police Department received a 911 call from Rashonda Wallace reporting that she had been robbed at gunpoint. Detective Sam Quate and uniformed Officer Demorest interviewed Wallace that same day. Wallace claimed that she had been playing cards with an individual she only knew as "Marcus," or "AWOL," and another juvenile suspect that she knew personally. She alleged that during the game Marcus brandished a semi-automatic handgun and threatened: "Give me all your money or spill your noodles, bitch." (Tr. 46.) She said she complied and gave him four hundred dollars. When Marcus made his demand, the juvenile suspect took Wallace's cell phone so that she could not call the police. Marcus and the juvenile suspect ran away through an open field, and Wallace then immediately went to a friend's house to call the police.

In addition to giving Detective Quate the Defendant's first name (Marcus) and his street name (AWOL), as well as the juvenile suspect's full name, she gave physical descriptions of both suspects. She said that Marcus had a number of tattoos, including one of a tear drop near his eye. With this information, Detective Quate was able to prepare a photo array that included the Defendant's picture. He presented the photo array to Wallace, and without any hesitation she picked the Defendant out as the culprit.

On June 7, 2007, Detectives Brent Roddy and Sam Quate asked Officer Chris Hoffman to attempt to locate the Defendant for questioning related to the armed robbery of Wallace. The detectives made the request of Officer Hoffman because of his familiarity with many criminal suspects in the southeast quadrant of the city. The next day, between 6:00 p.m. and 7:00 p.m. (it was still light out) on his way to a different call, Officer Hoffman drove past the 1300 block of Pontiac Street where he saw the Defendant walking east. Officer Hoffman recognized the Defendant from prior interactions with him. Officer Hoffman radioed the southeast police channel and advised officers in the area that detectives wished to speak with the Defendant in relation to an armed robbery.

Officers Gary Hensler and Anthony Smith heard Officer Hoffman's statement over the radio and immediately drove to the 1300 block of Pontiac Street where they too saw the Defendant walking east. Officer Hensler was familiar with what the Defendant looked like from several previous investigations and from having arrested him recently on an outstanding warrant.

When the officers heard over the radio that the Defendant was wanted for questioning, they only knew that he was a suspect in the armed robbery. They did not know the factual details of the crime. While on their way to Pontiac Street, they reviewed the police Spillman system,

3

which provides information about the dangerousness of individuals with whom police officers have encountered in the past. The Spillman system identified the Defendant as "a party armed," "Code x," "resisting law enforcement," and as having "made threats to shoot another officer" in the past. (Tr. 15.) "Party armed" means that an individual has had some sort of involvement with a police officer who deemed it important to warn other officers that the individual was previously encountered carrying a weapon that can do harm to others. "Code X" means that an officer should take extra caution because the person is a dangerous individual. The previous week Officer Hensler had been called to an address where a witness alleged that the Defendant had just been at his front door and threatened that he was going to go get a gun, shoot the witness, and shoot up his house. Prior to June 8, Officer Hensler had also learned that the Defendant was a suspect in several shootings.

     Officer Smith was driving the police car—a black unmarked squad car with blue and red police lights in the dash and along the roof line of the windshield—as they approached the Defendant. The officers were in full uniform. When they came near him they did not activate the police lights. Officer Hensler got out of the car and began approaching the Defendant while Officer Smith stayed behind the wheel. When Officer Hensler approached the Defendant, he said: "Hey Marcus, I need to talk to you." (Tr. 14.) His tone was stern, but he was not yelling. The Defendant appeared nervous and continued walking away from the officers. He responded, "I don't have a warrant," and then began to reach into his left rear pants pocket with his left hand. (Tr. 18.) At this point, the Defendant and Officer Hensler were about five feet away from one another. Officer Hensler was concerned the Defendant might be reaching for a weapon. Adding to Officer Hensler's concern was the fact that the Defendant was wearing "baggy"

4

clothes that could easily conceal weapons. (Tr. 33.)

Officer Hensler immediately grabbed the Defendant's hand to prevent him from reaching into his pocket, and he instructed the Defendant not to reach toward his pocket. Because the Defendant "tense[d] up" as Officer Hensler grabbed his arm, he became concerned that the Defendant might become aggressive or try to flee. (Tr. 19.) During this time, the Defendant was saying things like he "doesn't have a warrant," the police "can't touch him," and "if he shows [the police] his I.D., [they] can't touch him." (Tr. 19.) These statements indicated to Officer Hensler that the Defendant was hiding something.

Up to the point where Officer Hensler grabbed the Defendant's arm, Officer Smith had remained in the car as a precaution in case the Defendant were to flee. Officer Hensler raised the Defendant's left arm up higher, and Officer Smith then came and grabbed the Defendant's right arm. Officer Hensler felt the outside of the pocket that the Defendant was reaching for and "felt a large bulge" that was "crinkling." (Tr. 20.) Based on his training and the feel and texture of the bulge, Officer Hensler concluded that he had come across a bag of marijuana. He removed the bag from the Defendant's pocket, and he discovered that it was a large, clear plastic bag containing a little over forty grams of marijuana. The officers then handcuffed the Defendant.

Both officers conducted a safety pat down at that point. During the course of that search, Officer Smith felt a large bulge in the Defendant's waistband that he believed was a handgun. He lifted the Defendant's shirt and saw a handgun. Officer Smith held the Defendant's arms in the air while Officer Hensler retrieved the handgun from the front right side of the Defendant's waistband. The gun was loaded. The officers then contacted the police records department to find out whether the Defendant had a gun permit. He did not, and the computer search indicated

5

that he had a domestic violence conviction that would disqualify him from being permitted to possess a firearm.

Officer Tapp and Detective Roddy arrived shortly after the Defendant was in custody. When he arrived at the scene, Detective Roddy called Detective Quate, who was out of town, to ask him how he wanted Detective Roddy to proceed since the armed robbery investigation was Detective Quate's. Detective Quate instructed Detective Roddy to review the case file that he had prepared and, if he felt comfortable, to interview the Defendant. Detective Roddy then instructed the officers to transport the Defendant to the detective bureau for questioning regarding the armed robbery.

When Detective Roddy arrived back at the police department, he called Wallace to get the details of the robbery directly from her. Wallace's statements in this second interview were entirely consistent with the statements she gave to Detective Quate. Detective Roddy then reviewed Detective Quate's notes to prepare to interview the Defendant. After making these preparations, Detective Roddy waited for Detective Carry Young to arrive because Detective Young also wanted to interview the Defendant in reference to some homicide investigations in which the Defendant was a suspect.

After the detectives interviewed the Defendant, he was booked on four charges: felony possession of marijuana, possession of a handgun without a permit, possession of a handgun by a domestic batterer, and armed robbery. Detective Roddy prepared a probable cause affidavit later in the evening between 8:00 p.m. and 9:00 p.m. for the armed robbery charge based on information in the original case report and the two victim statements.

**ISSUES**

Through his motion to suppress, the Defendant seeks to have the Court "suppress as evidence herein all evidence obtained from the initial detention of the Defendant by officers of the Fort Wayne Police Department on June 8, 2007 and all other evidence gained subsequent to such detention as fruits of an illegal search . . . ." (Mot. to Suppress 1, DE 19.) The Defendant believes that his detention was unlawful because the arresting officers lacked an arrest warrant, and they lacked either reasonable suspicion or probable cause to believe that the Defendant was in the act of committing a crime, had recently committed a crime, or was about to commit a crime. If the detention was unlawful, the Defendant argues any evidence obtained subsequent to the arrest must be suppressed as fruit of the poisonous tree. Furthermore, even if a protective search of the outer clothing was permissible, the Defendant does not believe the officers could seize the drugs under the plain feel doctrine.

The government argues that there was probable cause to arrest the Defendant for the armed robbery, and so any search of the Defendant's person and the immediate vicinity incident to an arrest would be lawful. Regardless, the government argues there was at least reasonable suspicion for an investigatory stop and a protective pat down to search for weapons. Finally, the government argues that the plain feel doctrine does support the officers' seizure of the drugs and firearm.

**CONCLUSIONS OF LAW**

The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants

7

>shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. "It is a first principle of Fourth Amendment jurisprudence that the police may not conduct a search unless they first convince a neutral magistrate that there is probable cause to do so." *New York v. Belton*, 453 U.S. 454, 457 (1981). However, there are exceptions to this general warrant requirement. After all, the Fourth Amendment does not "of its own force require a warrant for any search. Its text is a *limitation* on warrants . . . ." *United States v. Limares*, 269 F.3d 794, 799 (7th Cir. 2001) (emphasis in original).

"A warrantless search or seizure is *per se* unreasonable unless the police can show that it falls in one of a carefully defined set of exceptions based on the presence of exigent circumstances." *United States v. Richardson*, 208 F.3d 626, 629 (7th Cir. 2000) (quotation marks omitted) (quoting *United States v. Bennett*, 908 F.2d 189, 192 (7th Cir. 1990) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 474–75 (1981))). It is worth noting that the exigent circumstances give rise to a particular category of exception (i.e. automobile, search incident to arrest, etc.), which is not the same as requiring that every instance covered by a given category reflect any particular exigency beyond that which defines the category. The two relevant exceptions requiring analysis in this case are the search incident to arrest exception and the exception for safety pat downs in furtherance of investigatory stops.

**A.     Search Incident to Arrest**

The Defendant argues that when the officers were patting him down, he was under arrest. (Mem. in Support of Mot. to Suppress 6, DE 23) ("[T]he Defendant's arrest was unlawful.

Therefore, any search of his person was also unlawful . . . ."). If the Defendant is correct, then the lawfulness of the search depends on the lawfulness of the arrest.

"It has long been the rule that law enforcement officers may conduct a full search of an arrestee in order to discover weapons the arrestee might be carrying and to preserve evidence that might be destroyed." *United States v. Sawyer*, 224 F.3d 674, 678 (7th Cir. 2000) (citing *United States v. Robinson*, 414 U.S. 218, 235 (1973)). An arresting officer may not only search the arrestee for weapons and evidence, but he may also search the surrounding area into which the arrestee might reach to grab any weapons that could be used to escape or resist arrest. *See Chimel v. California*, 395 U.S. 752, 763 (1969). However, the fruits of a search incident to an arrest can only survive a Defendant's motion to suppress if the arrest itself was legal. *Sawyer*, 224 F.3d at 678.

"A warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003). *See also United States v. Chapman*, 954 F.2d 1352, 1357 (1992) ("When probable cause exists to believe that an individual has committed a felony, police may arrest the individual outside his home without an arrest warrant). "Probable cause to arrest means evidence that would warrant a prudent and reasonable man (such as a magistrate, actual or hypothetical) in believing that a particular person has committed or is committing a crime." *Sibron v. New York*, 392 U.S. 40, 75 (1968) (Harlan, J., concurring).

The probable cause standard "is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not

9

legal technicians, act." *Pringle*, 540 U.S. at 370 (citation and quotation marks omitted). It is a "fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 233 (1983). "The complaint of a single witness or putative victim alone generally is sufficient to establish probable cause to arrest unless the complaint would lead a reasonable officer to be suspicious, in which case the officer has a further duty to investigate." *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003).

The arresting officer himself does not necessarily need to be aware of the circumstances giving rise to the probable cause determination to effect a lawful arrest. If law enforcement officers are communicating with one another regarding a suspect, the knowledge of one officer is imputed to the other officers. *Sawyer*, 224 F.3d at 680. This is known as the "collective knowledge doctrine." *Id.*

> For instance, if officers from an Illinois police department have probable cause to arrest a suspect and they send a bulletin regarding the suspect to police departments in Wisconsin, a Wisconsin police officer may arrest the suspect without personal knowledge of the facts and circumstances supporting the probable cause possessed by the Illinois officers who sent the bulletin.

*Id.*

Assuming the Defendant was under arrest at the moment of the search, then the evidence the Defendant seeks to suppress, the marijuana and firearm, was seized by Officers Hensler and Smith incident to a lawful arrest. The general rule that a putative victim's complaint alone is sufficient to establish probable cause applies in full force here. *See Beauchamp*, 320 F.3d at 743. Wallace identified the suspect as "Marcus," which is the Defendant's name. She described tattoos consistent with the Defendant's, and she identified him out of a photo array without

hesitation. The Defendant does not point to anything in Wallace's statements that would lead a reasonable officer to doubt her report and therefore give rise to a duty to further investigate. While it is premature to evaluate whether the government's case will yield proof beyond a reasonable doubt, Wallace's allegations would at least warrant a prudent and reasonable person in believing the Defendant committed the crime of armed robbery. Because the Defendant was in a public place, and there was probable cause to believe he had committed a felony offense, his arrest without a warrant would be lawful, as would a search of his person and the immediate vicinity incident to that arrest.

Because Detective Quate was aware of the facts establishing probable cause, and because he communicated with Officer Demorest, who in turn communicated with Officers Hensler and Smith, about locating the Defendant for questioning, Detective Quate's knowledge is imputed to Officers Hensler and Smith. If a police officer in Wisconsin can legally arrest a suspect based on nothing more than a bulletin from an Illinois police department without actually learning of the facts supporting the probable cause determination, then officers within an individual police department can surely rely on similar internal bulletins.

The Defendant acknowledges that a search incident to an arrest is lawful so long as the arrest itself is lawful. However, he contests the lawfulness of that arrest. He believes his arrest was unlawful because the officers "had no indication that he was committing, about to commit, or *just* had committed, a criminal offense or traffic violation." (Mem. in Support of Mot. to Suppress 6, DE 23) (emphasis added). The government responds that even if the officers had no such indications, there is no requirement that offense must have *just* been committed to support a warrantless arrest. The Court agrees with the government, especially since the Defendant does

11

not cite to any case law in support of such a requirement.

The Supreme Court and Seventh Circuit have been straightforward in saying that it is always reasonable under the Fourth Amendment for an officer to arrest an individual in a public place without a warrant for either a felony committed anywhere or a misdemeanor committed in the officer's presence if the arrest is supported by probable cause. *Maryland*, 540 U.S. at 370; *Chapman*, 954 F.2d at 1357. Nonetheless, the Defendant argues that implicit in the case law is a limitation that this exception to the warrant requirement only applies when either Congress has specifically granted authority to law enforcement agencies to make warrantless arrests based on probable cause or where exigent circumstances make getting an arrest warrant impracticable.

The Court does not agree that these two limitations find support in the case law. As for the first limitation, the Supreme Court has recently rejected it. In deciding that state police officers did not violate the Fourth Amendment by effecting a warrantless arrest and seizing evidence incident to that arrest when state law required issuing a summons to the Defendant and prohibited arresting him, the Court explained "[w]e are aware of no historical indication that those who ratified the Fourth Amendment understood it as a redundant guarantee of whatever limits on search and seizure legislatures might have enacted." *Virginia v. Moore*, 128 S. Ct. 1598, 1602 (2008). The reference to "legislatures" applies equally to state legislatures as well as the federal legislature.

As for the second suggested limitation that exigent circumstances must exist beyond those giving rise to the category of warrant exception, both Congress and the Supreme Court have rejected it. In *United States v. Watson*, 423 U.S. 411, 423 (1976), the Court observed that "Congress has plainly decided against conditioning warrantless arrest power on proof of exigent

12

circumstances." Consistent with that policy decision, the Court determined it must decline "to transform this judicial preference [for warrants] into a constitutional rule when the judgment of the Nation and Congress has for so long been to authorize warrantless public arrests on probable cause rather than to encumber criminal prosecutions with endless litigation with respect to the existence of exigent circumstances, whether it was practicable to get a warrant, whether the suspect was about to flee, and the like." *Id.* at 423–24.

The Defendant does not argue that the search exceeded the scope of what would be permissible for a search incident to an arrest, and the Court is aware of no basis for such an argument. He instead rests his argument, as he must, on the lawfulness of an arrest. Because the officers had probable cause to arrest the Defendant, any contraband seized from his person or the immediate vicinity incident to an arrest is lawful.

Ordinarily the distinction between an investigatory stop and a formal arrest is crucial because a formal arrest requires the more demanding standard of "probable cause" as opposed to just "reasonable suspicion." *See Smith v. Ball State Univ.*, 295 F.3d 763, 768 (7th Cir. 2002). However, if an officer has probable cause to make an arrest, he necessarily has the reasonable suspicion required to conduct an investigatory stop. *Jones v. Webb*, 45 F.3d 178, 183 n.3 (7th Cir. 1995). Because the officers in this case had probable cause to make an arrest, the determination of whether they made an investigatory stop or an arrest is not all that important. Nonetheless, the seizure of the firearm and drugs is more accurately characterized as resulting from a safety pat down during an investigatory stop, which is the second relevant exception to the warrant requirement requiring analysis in this case.

**B.     Investigatory Stop**

Even if the Defendant were correct that the armed robbery investigation that preceded the Defendant's detention did not alone support a warrantless arrest and subsequent search incident to arrest, the evidence was still properly seized under *Terry v. Ohio*, 392 U.S. 1 (1968).

"A *Terry* investigative stop is a brief detention which gives officers a chance to verify (or dispel) well-founded suspicions that a person has been, is, or is about to be engaged in criminal activity." *United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995) (citation and quotation marks omitted). Because there are "endless variations in the facts and circumstances, there is no litmus-paper test for determining when a seizure exceeds the bounds of an investigative stop and becomes an arrest. The crux of [the] inquiry is whether the nature of the restraint imposed meets the Fourth Amendment's standard of objective reasonableness." *United States v. Stewart*, 388 F.3d 1079, 1085 (7th Cir. 2004) (internal citations and quotation marks omitted). "Once police have the reasonable suspicion needed to justify an investigatory stop, they may use the forcible means necessary to effectuate that stop, provided their actions are reasonable under the circumstances." *United States v. Weaver*, 8 F.3d 1240, 1244 (7th Cir. 1993). Placing a suspect in handcuffs does not transform a *Terry* stop into a formal arrest if the officer reasonably believes that a suspect is potentially dangerous. *See id.* at 1086.

To determine whether an investigatory stop was reasonable, a reviewing court must examine: "(1) whether the police were aware of specific and articulable facts giving rise to reasonable suspicion; and (2) whether the degree of intrusion was reasonably related to the known facts." *United States v. Tilmon*, 19 F.3d 1221, 1225 (7th Cir. 1994). The "reasonable suspicion" test is objective and based on the totality of the circumstances known to the officer at

14

the time of the stop. *United States v. Amaral-Estrada*, 509 F.3d 820, 827 (7th Cir. 2007).

The government has the burden of establishing the reasonableness of an investigatory stop and any resulting search. *United States v. Pavelski*, 789 F.2d 485 (7th Cir. 1986). "Reasonable suspicion is a quantum of proof less demanding than probable cause, but a hunch will not suffice. There must be some minimal level objective justification for making a stop." *United States v. Brown*, 188 F.3d 860, 864 (7th Cir. 1999) (internal citations and quotation marks omitted). The police officer need only provide articulable facts giving rise to a reasonable suspicion that a suspect has already committed a crime, is in the process of committing a crime, or is about to commit a crime. *Lawrence v. Kenosha County*, 391 F.3d 837, 842 (7th Cir. 2004). The collective knowledge doctrine applies in the *Terry* context as well. *United States v. Lenoir*, 318 F.3d 725, 728 (7th Cir. 2003).

"In the course of a *Terry* stop, an officer may conduct a protective search for weapons of an individual's person, and area within his control, if 'a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *Cady v. Sheahan*, 467 F.3d 1057, 1061–62 (7th Cir. 2006) (quoting *Terry*, 392 U.S. at 27). "To justify a warrantless pat-down search without probable cause, the officer must also be able to point to specific and articulable facts indicating that the individual may be armed and present a risk of harm to the officer or others." *Brown*, 188 F.3d at 864. If the officer reasonably believes he feels an object likely to be drugs during the safety pat down, he can retrieve the drugs if the search is not unduly invasive. *See United States v. Thomas*, 512 F.3d 383, 388–89 (7th Cir. 2008). The object must be readily apparent as contraband without further manipulation. *See Minnesota v. Dickerson*, 508 U.S. 366 (1993); *United States v. Rivers*, 121 F.3d 1043, 1046 (7th

15

Cir. 1997).

When Officers Hensler and Smith heard Officer Hoffman's radio dispatch, they may have planned on arresting the Defendant once they satisfied themselves that he was the individual with whom detectives wanted to speak. They also may have simply hoped to have the Defendant voluntarily meet with detectives for questioning. But when they first engaged the Defendant, they were merely stopping him for brief questioning consistent with an investigatory stop. The evidence does not indicate that at the point they were requesting to speak with the Defendant they were effecting an arrest. Officer Hensler merely said, "Hey Marcus, I need to talk to you." (Tr. 14.) The officers did not communicate to him that they would be detaining him because he committed a crime. The officers' actions would have only transformed the investigatory stop into an arrest if the actions were disproportional to the officers' reasonable suspicions. The issues then become whether the officers were reasonably suspicious that the Defendant had committed a crime and whether they were reasonably concerned that he posed a danger to the officers' safety.

For the same reasons that the officers had probable cause to believe the Defendant had committed a crime, they had a reasonable suspicion of the same. Wallace provided Detective Quate with sufficient details to warrant his suspicion that the Defendant committed the armed robbery. His knowledge is imputed to Officers Hensler and Smith through the collective knowledge doctrine. These articulable facts constitute more than a "hunch," and they objectively would warrant a reasonable officer's belief that the Defendant had committed a crime.

Likewise, the officers' pat down and handcuffing was prompted by a reasonable concern that the Defendant posed a threat to their safety. The information in the computer system

16

identifying the Defendant as "a party armed," "Code x," "resisting law enforcement," and as having "made threats to shoot another officer" in the past would warrant a reasonable person's concern that the Defendant might be armed and pose a threat to the safety of the officers and innocent bystanders. (Tr. 15.) Officer Hensler's familiarity with the Defendant's previous violent threats and the fact that he was a suspect in several shootings would also justify such a concern. Finally, the Defendant's reaching into a pocket that the officers feared might contain a weapon and "tensing up" when they grabbed his arm would also make a reasonable person apprehensive that the Defendant might be dangerous.

     Given that the officers reasonably suspected that the Defendant might use a weapon to harm the officers, conducting a protective search and handcuffing the Defendant were reasonable and appropriate safety precautions. While the Defendant implies that he was just reaching for his identification, officers must be permitted to assume the worst when their safety or the public's safety is at risk. Because handcuffing and patting the Defendant down was an appropriate response to a reasonable fear that the Defendant posed a threat to the officers, those actions did not transform the investigatory stop into an arrest.

     When they patted the Defendant down, the officers discovered that he possessed a bag of marijuana and a handgun. The officers testified that based on training and experience they could plainly feel that the Defendant had a handgun in his waistband and drugs in his pocket from their search of his outer clothing. The Defendant implies that this is unrealistic, but there was no evidence introduced to undermine the officers' credibility or to call into question the believability of their claim that they are capable of recognizing drugs and guns by feel from the pat down of an individual's outer clothing.

17

Officers Hensler and Smith had a reasonable suspicion that the Defendant had previously committed an armed robbery and were therefore justified in initiating an investigatory stop of the Defendant. They reasonably feared for their safety, both because of prior involvement with the Defendant and because of his behavior during the stop, so it was appropriate for them to handcuff the Defendant and pat him down. During the pat down they felt drugs and a firearm on his person without having to further manipulate the contraband. It was therefore legal to seize that evidence, and the Defendant's motion to suppress the evidence must accordingly be denied.

**ORDER**

For the foregoing reasons, the Defendant's Motion to Suppress [DE 19] is DENIED. This matter is now set for a telephonic scheduling conference before Judge Theresa L. Springmann on June 4, 2008, at 12:00 PM. The Court will initiate the call.

SO ORDERED on June 2, 2008.

    s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT